The next case on the calendar is Bat v. Buccilli. Judge Winter, did you want to say something just to make sure we're able to hear you at the start of this argument? Yes, can you hear me? Yes, we're set to go. Good to go. Thank you, Judge Livingston. My name is Peter Kamakiwo'ole on behalf of the appellants, the Bats. Any invasion of the home by even a fraction of an inch is per se unreasonable unless officers have probable cause and either obtain a warrant or confront exigency that consists of more than the mere possibility of danger. Yet on page 38 of the Special Appendix, the District Court awarded Lt. Buccilli qualified immunity for his warrantless, forcible entry into the Bats' home because it could not find a case that addressed the constitutionality of a welfare check conducted in a location at the request of Adult Protective Services. That decision should be reversed for two reasons. First, officers cannot sidestep clearly established law by giving novel names to constitutional violations of the Fourth Amendment. And second, Lt. Buccilli lacked the probable cause and exigent circumstances necessary to enter a home in the absence of a warrant. To the first point, officers cannot sidestep clearly established law by giving novel names, in this case a welfare check, to what is otherwise a clear constitutional violation. Why wasn't there an objectively reasonable basis here to believe that an adult inside the home might need help? Objectively reasonable basis is language straight from Brigham City. That's correct, Your Honor. In Brigham City, the court made it very clear, as it has in multiple cases before and since, that the objective reasonableness turns on what the officer knew at the time and the circumstances that he confronted at the home. If one takes a look at what the officer knew, for example, the first thing that needs to be said is that there's a very clear factual dispute about what Lt. Buccelli knew. He claims repeatedly in his brief that he knew that there was a possibility that Fred Pontiero was in danger. He references dehydration and lethargy and failure to thrive in his brief. And yet, the evidence most favorable to the Batts, which is the controlling evidence of this procedural posture, is that when Lt. Buccelli entered the home, he told Joseph Batt, I know only that Adult Protective Services asked me to make a welfare check. He stated specifically he did not know the allegations. He couldn't share them with the Batts because he didn't know them. At the very least, this produces a material question of fact and precludes summary judgment on that basis. Moreover, if one takes a look at, even if one were to consider the facts most favorable... These arguably exigent circumstances, he thought there might be someone who was in distress. Judge Chin, they are not. The reason is because this court has held repeatedly in Tierney v. Davidson and in Kerman v. City of New York that the mere possibility of danger is not enough to enter a home. The test is whether there's a probability of danger. And if one takes a look at the allegations... In addition to what he had heard, there was also some concern because the grandson wouldn't let him in, which seemed to raise questions in his mind as to whether they might be hiding something and he wanted to check. Is that unreasonable? Your Honor, this court has... What I would say to that is that if one takes a look at the emergency aid cases that this court and the Supreme Court have looked at, in no case is the mere withdrawal into a home without something else constituted an exigent circumstance. The closest case in the record that deals with that sort of scenario where somebody enters a home and that gives rise to an exigency is the district court case in Howard v. DeWitt. Is this court's case in 2014, United States v. Andino, where the suspect was... Before the suspect opened the door, the officer said, We have a report that there's cocaine. And without another word, the suspect immediately re-enters back into the home. And this court held in that case that that action... That's different. I mean, I... Go in and get evidence, but here the officer, an objective officer, has a report that there is an elderly gentleman inside at risk, and the grandson doesn't want to let him in. So he wants to check. Is that so unreasonable? Again, Judge Shin, that question, first of all, assumes that Lieutenant Bocelli knew anything about the allegations about the individual being in the house. And again, there's a material dispute of fact. But even if he did, even... from an individual who said, Your Honor, what's undisputed is that Lieutenant Bocelli knew that APS had asked him to obtain a welfare check. Everything else is in dispute. Lieutenant Bocelli specifically says he doesn't know anything else about any of the allegations. He doesn't know that a family member called. He doesn't know that there are reports that the individual had not been seen. But again, even if one assumes that Lieutenant Bocelli knew those things, as he's undoubtedly going to argue when his counsel comes up here, even if he knew everything APS knew, there's not more than a mere possibility of danger. The allegations themselves come in three forms. First, Annette Pontiero stated that two weeks prior, her husband had thought that his father might have been dehydrated. Again, Tierney makes it very clear, the mere possibility of danger is not a sufficient exigency to enter a home. And again, we're talking about a home. We're not talking about a public place or a vehicle or a hospital. We're talking about a home. The probable cause requirement is necessarily higher. The other important thing is that what we discovered in discovery, and what Lieutenant Bocelli discovered in discovery, is that in addition to the allegations about the welfare of Mr. Pontiero, Annette also disclosed that she had not been in the Batts' home, could not know what was going on in the Batts' home, and in fact had animosity towards Lou Ann Batt. And the social worker, when we deposed her, stated very clearly that that's a trigger sign for APS, that allegations that come up in a situation of animosity are more likely to be false. Again, going to the probability, which is the necessary standard. Even if Lieutenant Bocelli knew everything that APS knew, there's still only a mere possibility of danger, and I think it's telling that Lieutenant Bocelli's brief repeatedly refers to it as only a mere possibility of danger or a possible exigency again and again and again. The test is whether there is probable cause of an actual emergency. I guess I don't read Brigham City to talk about probable cause. I don't think probable cause is even mentioned in Brigham City, and it could be said to be the most recent Supreme Court authority on the subject of these types of intrusions. And they talk about the objectively reasonable basis for believing that medical assistance is needed. And in terms of with that articulation, it seems like there was some basis, and it may not be objectively reasonable given that they didn't know very much, but I don't think it's probable cause. Am I wrong about that? Your Honor, I don't recall off the top of my head if Brigham City addresses probable cause. What I do know is that four years prior in Kirk v. Louisiana, the Supreme Court held specifically that a forcible entry into a home does require the existence of both probable cause and an exigency in the absence of a warrant. Additionally, I think it's very clear that had the court in Brigham City actually addressed the probable cause issue, there clearly would have been. The police observed an altercation from the outside in the home that was sufficient to draw blood. The situation in this case is nowhere near that, nowhere near anything in Brigham City. For that reason, we'd urge the court to reverse. Thank you, Your Honor. Thank you. Excuse me. Good morning. May it please the court. I'm Norm Green, and I represent Joseph Basile, a police officer of the town of Orchard Park. I think the court may have put their finger on one of the essential issues here. This was not something that Officer Basile sought out. The Adult Protective Services senior caseworker, Diane LoCicero, called the Orchard Park Police Department dispatcher and related a lot of information. That information is recited in the record, and that information is relevant to what the police department in Orchard Park knew. Maybe it was the dispatcher, but the dispatcher then related to Officers Cady and the defendant here who sued in his individual capacity under a 1983 claim is essentially told the following. Two weeks ago, April 12, 2012, the son goes out there and notices that his father is dehydrated. Why is that important? Because he had previously been hospitalized for dehydration and failure to thrive. The argument is that there's a factual question as to whether the officer knew those things, and if you look at what he actually said when he walked into the house and accept what he said, then we can't assume that he had that knowledge. How do you respond to that argument? Well, there are certain uncontroverted facts which are referenced in the record. My point is this, that there was a considerable fount of information relative to this man's in extremis, potentially, condition. And I don't think that's a question of fact. In other words, the very day before the son went out there, he was refused permission to see his dad. That's on April 16. That's when his wife then calls the senior caseworker and says, I think we've got a problem. And instead, because they're overwhelmed and overburdened, they ask the police to do it. Now, this isn't really a law enforcement function. You know, we have a tendency to fluff over other responsibilities of police officers. This city in the last 20 years to serve and to protect means a lot. It's not a law enforcement function. This was not a criminal thing. Nothing was seized. Nothing was searched. That's not to say that the Fourth Amendment is not sacrosanct. It is. But when you go out there and you're told, you, the police department, are told, we've got a problem out there. And a 23-year-old kid is then requested, well, we're here to do a welfare check. We're not investigating criminality. We're not here to search a thing. We just want to see how your 82-year-old grandfather's doing. And the youngster then says, now, already there's a heightened suspicion because Officer Katie, who's with Basili, is aware because he talked to the dispatcher and learned everything that Diane LoCicero had advised relative to the concerns about a very serious physical and mental condition because he was suffering from senility as well. This guy is 82. Now, the situation then becomes this. They're in the driveway. Is this reasonable? Would you have your grandpa come to the door? No. Would you have your grandpa come to the window? No. We just want to see how he is. That's all we want to do. We're not here in any law enforcement function. We're here to serve and to protect. That's what our responsibility is, as though we were an APS worker. If they weren't, do they need a warrant? You're not arguing that the entry into the home is reasonable simply because there was no law enforcement purpose. I mean, that is specifically rejected by the Supreme Court. I understand that. But I am relying on Brigham City, and I'm relying on the other cases that I set forth. And I'm also . . . not just with respect to reasonableness, but that was the basis for Magistrate Justice Fascio's determination. But the district court judge determined qualified immunity, and under the litany of cases that I've cited in that point, point two of the brief, he certainly should be, Officer Basile, certainly accorded qualified immunity under this court's decisions in a number of cases that are absolutely directly in point, and I noticed that issue was not discussed. So I think what District Court Judge Geraci said was, I'm not going to discuss what Fascio did in his report and decision, but I'm going to say, in any event, there certainly is a qualified immunity, because you can't . . . there is no proof that there was any generation of hostility by Officer Basile. He was, I would suggest, a paragon of reason up until the point where it was necessary for him to enter the home. Now, let's do the opposite. He says, okay, we're going to walk away. This guy gets sick. He's hospitalized. He dies. Don't you think some artful plaintiff's lawyer is going to someday cross-examine him from a standpoint of, your department knew that he failed to thrive. They knew two weeks before that he was dehydrated. The father, the son, failed to be admitted to see his dad the day before, and are you telling me you just walked away and let this guy die? You got yourself a 1983 case in a far different context because of the failure of the police officers to act. So, in a sense, what you've got is a situation where qualified immunity fits the bill. You don't want him to be damned if he does and damned if he doesn't. But that's the quandary that presented itself for this officer when he's standing in the driveway. Mr. and Mrs. Batt aren't home. They're plaintiffs in this case, but they weren't even home. And what you have is you have a caseworker come out later, Nancy Sullivan, and she's readily admitted. When the officer does enter the home, he does what he's supposed to do. He doesn't search. He doesn't seize, and I think this is a factor. But what he does is he sees that this guy, not in real good shape, but he's not in need of an ambulance, so to speak. And that being the case, under those circumstances, when you look at the volume of cases that deal with the issue of qualified immunity, all of which I cited, and because the language of this court is far superior to mine, I set forth at considerable length on pages 40 and 41 the very language of this court which fits this case to a T on qualified immunity. There was no ill motive here. His entire actions belie any hostile motive. He didn't touch a thing. Now, some people might say that looking at it from the officer's point of view, this kid presented a problem. And that's not to say, because I would never say, that the Fourth Amendment is less than sacrosanct. It absolutely is. And I don't think Officer Bacilli felt any different, but he felt himself betwixt and between. And by that, I mean that he was absolutely in a situation where he couldn't come out on top. Now, what we've got here, and I dealt with it in the brief, is nobody in the Orchard Park Police Department knew that the Bats homeschooled their kids. They didn't care. That had nothing to do with this. Now, the attorneys that got involved were those who represent the interests of those in the United States who were homeschooled. We have no problem with that. That's not an issue in this case, and it shouldn't be an issue in this case. But it's one of those things where you say to yourself, you know, there's a predicate here that's below the surface. This guy gets sued in his own capacity. He's left to stand on his own merit before this court, and stand he does. Now, if you folks, if the court members have any questions, I'd be happy to try to answer them, but otherwise, I would rest on the contents of my brief. Thank you. May it please the court. Opposing counsel just referenced his major argument throughout the briefs, which is that Lieutenant Bocelli didn't commit a search, didn't seize anything. And what this argument fails to grasp is that in United States v. Jones, decided four months before Lieutenant Bocelli's warrantless entry, the Supreme Court held that any time government officials enter a constitutionally protected area to collect information, it is a search. There's no doubt that Lieutenant Bocelli entered a home, a private home, which is clearly constitutionally protected, and his opposing counsel has argued numerous times that the sole purpose of that entry was to collect information on the health and well-being of Lieutenant Bocelli. This is clearly a search, regardless of Lieutenant Bocelli's subjective intentions or purposes in entering the bat's home. Opposing counsel has tried to make something of the fact that Lieutenant Bocelli is sued on his own. The reason that he's sued on his own and that Officer Cady is not sued is because when Officer Cady was asked to leave, he did so. He respected the constitutional rights of the bats. Lieutenant Bocelli persisted, even though in his own terms, all he knew was that Adult Protective Services had asked him to conduct a search. The opposing counsel has also tried to direct this Court's attention to the danger that Joseph Batt apparently proposed, but according to Lieutenant Bocelli's own deposition testimony, he did not feel threatened by Joseph Batt. Joseph Batt did not use threatening words, did not place any hands on him. And opposing counsel has also referenced the fact that Joseph Batt apparently erred in failing to bring his grandfather to the window. And what needs to be said about that is that the reason Joseph Batt never brought his grandfather to the window was because he was never given a chance. Lieutenant Bocelli asked him to bring him to the window. Joseph Batt said, please wait outside. I'm going inside to make a phone call. You do not have my permission to enter. And rather than waiting outside, Lieutenant Bocelli follows Joseph Batt into the home so closely that he is in the doorway. I understand the record. Your client did not say that I want to go inside and bring him to the window. He didn't testify in discovery at all about that exchange. That is correct, Your Honor. He did not. But that doesn't change the fact that he was not given an opportunity. Lieutenant Bocelli was so close behind him that he was in the doorway as Joseph Batt turned around to close the door. For these reasons, we urge this court to reverse the decision below. Thank you, Your Honor. Thank you both. We'll take it under submission.